IN THE MATTER OF ALAN J. KARCHER, INDIVIDUALLY AND AS SPEAKER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AND CARMEN A. ORECHIO, INDIVIDUALLY AND AS PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, APPELLANTS AND CROSS-RESPONDENTS, v. THOMAS H. KEAN, GOVERNOR OF THE STATE OF NEW JERSEY, RESPONDENT AND CROSS-APPELLANT.

Argued March 20, 1984—Decided August 6, 1984.

484

*Albert Burstein* and *Leon J. Sokol* argued the cause for appellants and cross-respondents (*Rosen, Gelman & Weiss,* and *Greenstone & Sokol,* attorneys; *Albert Burstein, Leon J. Sokol,* and *Lawrence T. Marinari,* of counsel; *James H. Laskey, Jill E. Haley* and *Priva H. Simon,* on the briefs).

*Michael R. Cole,* First Assistant Attorney General, argued the cause for respondent and cross-appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *William Harla,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This appeal requires our consideration of the nature and extent of the Governor's constitutional power to veto line-items

in the state budget that are encompassed in the annual appropriations act. The instant controversy was triggered by the Governor's exercise of this constitutional veto power with respect to matters included in the Appropriations Act for fiscal year 1983.

## I

On June 30, 1982, the last day of fiscal year 1982, Governor Thomas H. Kean signed Senate Bill 1600 into law, *L.* 1982, *c.* 49 (generally, Appropriations Act, Act, or Senate Bill 1600). Although the Governor indicated in his message to the Senate that he had "seriously considered vetoing the entire budget," he had "resolved that this course would not be prudent and that the resulting fiscal crisis would severely damage the State." Accordingly, Governor Kean exercised his line-item veto power, pursuant to *N.J. Const.* (1947) art. V, § I, para. 15, appending to the bill a statement in which he deleted and reduced certain items of appropriation, and also deleted several general provisions that he determined to be in violation of constitutional principles.[1]

The Legislature did not exercise its constitutional power, pursuant to *N.J. Const.* (1947), art. V, § I, para. 15, to override any part of the Governor's line-item veto of the Appropriations Act. However, on August 13, 1982, Alan J. Karcher, Speaker of the General Assembly, and Carmen A. Orechio, President of the Senate, filed with the Appellate Division a Notice of Appeal from the final action of the Governor approving the Appropriations Act as modified by the line-item veto, contending generally that the Governor had exceeded the constitutional authority vested in him.

---

[1] The Governor certified the availability of revenues sufficient to support the appropriations made in *L.* 1982, *c.* 49, as required by *N.J. Const.* (1947) art. VIII, § II, para. 2.

The Appellate Division ruled that the Governor had properly exercised the line-item veto power with respect to several of the controverted provisions. 190 *N.J. Super.* 197 (1983). It upheld the Governor's veto of part of the appropriation for municipal state aid and the veto of several general provisions in the Appropriations Act that arguably were unconstitutional and were not items of appropriation or sufficiently related to any specific appropriation. The court, however, overruled the Governor's veto of several appropriations for specific highway projects encompassed in a larger appropriation for highway capital projects. Appellants then filed with this Court a notice of appeal as of right, in response to which the Governor filed a cross-appeal as of right. (We have generally referred to the legislative parties as appellants.) *See R.* 2:2–1(a)(1).

## II

Our Constitution mandates that withdrawals of monies from the state treasury can be accomplished only by legislative appropriation, and, further, that there shall be "one general appropriation law covering one and the same fiscal year." Its exact terms in this respect are:

> No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year. * * * [*N.J. Const.* (1947) art. VIII, § II, para. 2.]

The constitutional requirement of a unitary general appropriations law covering but a single fiscal year is the center beam of the state's fiscal structure. It expresses the basic understanding that fiscal soundness and integrity are the foundations for proper governmental operations. The constitutional plan for the expenditure of public revenues for governmental purposes centralizes and simplifies state financial affairs, serving to improve the operations of government, define fiscal commitments, and clarify official responsibility. *City of Camden v. Byrne*, 82 *N.J.* 133, 146 (1980), citing *Report of the Commission on Revision of the New Jersey Constitution* 26–27 (1942);

G. Skillman & S. Goldmann, "The Single Budget, Single State Fund and Single Fiscal Year" (Monograph 1951), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1668, 1669, 1680–83 [hereinafter cited as G. Skillman & S. Goldmann, "Single Budget"]; *New Jersey League of Women Voters, New Jersey: Spotlight on Government* 94–98 (3d ed. 1978).

■ The power and authority to appropriate funds are vested in the legislative branch of government. *City of East Orange v. Palmer,* 52 *N.J.* 329, 337 (1968); *Fitzgerald v. Palmer,* 47 *N.J.* 106, 108 (1966); *Gallena v. Scott,* 11 *N.J.* 231, 238–39 (1953); *Amantia v. Cantwell,* 89 *N.J. Super.* 7, 12–13 (App.Div. 1965). Although this power to appropriate and expend state monies is reserved exclusively to the Legislature, the Governor nonetheless plays a vital constitutional role in the budget process. The ultimate legislative authority over appropriations is subject to checks and balances from the executive. The Governor is statutorily authorized to "examine and consider all requests for appropriations" and to "formulate * * * budget recommendations to be forwarded to the Legislature for its consideration and ultimate approval." *N.J.S.A.* 52:27B–20. Further, and of critical relevance in this case, the Governor is constitutionally empowered to object to any item or items included in an appropriation bill through the exercise of a selective veto. *N.J. Const.* (1947) art. V, § I, para. 15. The enabling constitutional clause states:

If any bill presented to the Governor shall contain one or more items of appropriation of money, he may object in whole or in part to any such item or items while approving the other portions of the bill * * * and each item or part so objected to shall not take effect.

The Governor's statutory authority to propose the State budget, and his constitutional power to exercise a selective veto over legislative appropriations, constitute significant responsibilities for the State's fiscal affairs, and are essential to an efficient, modern system of government. *See City of Camden v. Byrne, supra,* 82 *N.J.* at 150; G. Skillman & S. Goldmann,

"Single Budget," *supra*, at 1683–84; S. Goldmann & B. Bland, "The Governor's Veto Power" (Monograph 1951), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1418, 1428; *A. Wildavsky, Budgeting: A Comparative Theory of Budgetary Processes* 175 (1975).

Reflecting the ultimate authority of the Legislature over the appropriations function, the Constitution provides that the Governor's veto may be overridden by a two-thirds vote of both the Senate and the General Assembly. The same constitutional provision that authorizes the executive line-item veto of appropriations continues:

> If upon reconsideration * * * one or more of such items or parts thereof [is] approved by two-thirds of all the members of each house, the same shall become a part of the law, notwithstanding the objections of the Governor. [*N.J. Const.* (1947) art. V, § I, para. 15.]

With the ultimate constitutional responsibility for appropriations vested in the Legislature, and with executive responsibilities so clearly involved in the budget process, the judiciary has accepted its own absence of authority to compel either the Legislature to make a specific appropriation or the Governor to recommend or approve one. *See City of Camden v. Byrne, supra*, 82 *N.J.* at 149 (even if amendment to appropriations act were held unconstitutional, no relief would be available through courts in absence of legislative appropriation); *Doe v. Mathews*, 420 *F.Supp.* 865, 870–72 (D.N.J. 1976); Mountain, "The Role of Judicial Activism: Neither Sword Nor Purse?," 10 *Seton Hall L. Rev.* 6, 11 (1979).

The claims made in this appeal focus not so much on the existence of the constitutional budgetary and appropriations authority that is both centered in and shared by the legislative and executive branches, but on the form and manner in which that authority has been exercised. The Governor takes the position that in several aspects the appropriations power of the Legislature has not been exercised correctly or lawfully in the Appropriations Act. The Legislature contends that the Governor has not properly exercised the line-item veto power. Reso-

lution of this controversy requires further examination of the basic features of an appropriations law.

■ An appropriation is an authorization, statutorily enacted by the Legislature, for the withdrawal of monies from the State treasury for governmental purposes. *City of Camden v. Byrne, supra,* 82 *N.J.* at 149; *Brown v. Honiss,* 74 *N.J.L.* 501, 521 (E. & A. 1906); *Borough of Glassboro v. Byrne,* 141 *N.J. Super.* 19, 24 (App.Div.1976), certif. den., 71 *N.J.* 518 (1976). There are, however, no specific constitutional standards or rules for determining the content or format of an appropriations act. Therefore, some inherent flexibility and discretion attend the fiscal-formulation process.

■ Items of appropriation have, historically and traditionally, been expressed in two different ways: as "budgeted revenue" and "appropriated revenue." An allocation of funds from "budgeted revenue" is a reservation or designation of a specific amount of money for a particular purpose. By contrast, "appropriated revenue" is reflected in the budget not as a specific numerical figure but by means of general language committing funds in an unspecified amount for a particular purpose.[2] *See Hopkins v. Ford,* 534 *S.W.*2d 792, 795 (Ky.1976). Appropriated revenue generally includes monies collected by the State and directly utilized by a state agency or paid to a local government in the form of state aid for a specific purpose enumerated by statute. In addition to the specification of monies appropriated for governmental uses, either expressed numerically as "budgeted items" or generally as "appropriated revenues," appropriations enactments have customarily included provisions that establish conditions, restrictions, or limitations on the expendi-

---

[2]"Appropriated revenues" have been defined as:

Those revenues not previously anticipated or budgeted, which upon receipt increase appropriation balances as authorized in the Appropriations Act, and from which agencies may incur obligations or make expenditures for specific purposes. [*Budget Message of Governor Kean,* March 15, 1982, Glossary, p. 21b.]

ture, use, or application of appropriated funds. *Welden v. Ray,* 229 *N.W.*2d 706, 710 (Iowa 1975) (all legislative appropriations are qualified to some degree: "[i]nherent in the power to appropriate is the power to specify how the money shall be spent"); *In re Opinion of the Justices,* 294 *Mass.* 616, 2 *N.E.*2d 789, 791 (1936) (absent restrictive words in state constitution, legislative body can attach conditions to expenditure of money appropriated by it); *see J. Burkhead, Government Budgeting* 313, 324 (1963).

An appreciation of these characteristics of appropriations legislation is important to an understanding of the issues implicated by the Governor's exercise of his line-item veto power in this case. In his veto statement, appended to the Appropriations Act and filed with the Legislature, the Governor expressed his general reasons for reducing and deleting specific items of appropriations set forth both as budgeted revenue and appropriated revenue.

> My veto recommendations are predicated on two issues. First, a budget totalling $6.2 billion must have an adequate surplus. Second, I feel it is inappropriate for the Legislature to increase the spending levels I initially recommended, and to fund new programs, in a budget that doesn't provide adequately for essential State services.

The Governor also deleted or vetoed general provisions in the Appropriations Act relating to the terms and conditions for the expenditure or application of appropriated funds. The veto message stated:

> In addition to various specific dollar appropriations in the budget, the Legislature has inserted certain language and provisions into Senate Bill No. 1600 to direct the manner in which the Chief Executive is to execute some of his responsibilities. Some of these legislatively imposed provisos and conditions are integrally and permissibly tied to specific items of appropriation. Other provisions, however, place broad restrictions on the way in which the Executive Branch administers particular areas of the State government on a day-to-day basis and, in some cases, authorize a Legislative Subcommittee to share responsibility with the Executive in matters traditionally and inherently assigned to the Executive Branch.

The challenges raised by the parties relate to the constitutional authority of the Governor's veto in four areas: (1) funds appropriated from the franchise and gross receipts taxes of

public utilities as state aid to municipalities; (2) funds appropriated or designated for particular highway projects included in the capital construction appropriations to the Department of Transportation; (3) general provisions relating to salaries, compensation, and the status of various state employee positions; and (4) a general provision restricting the funds appropriated for capital construction by the Department of Corrections. Each of these challenges touches upon a different facet of the Governor's line-item veto power.

### III

Two of the challenges raised by appellants concern the propriety of the Governor's veto of the appropriation of monies for specific governmental purposes. One such fiscal grant provides for the appropriation of public utilities' franchise and gross receipts tax revenues for municipal state aid. The other concerns specific appropriations for designated highway projects. As a matter of analysis, these claims concern both appropriated and budgeted revenues.

### A

■ Appellants challenge the Governor's line-item veto of an appropriation of the proceeds from the franchise and gross receipts taxes of public utilities as state aid to particular municipalities. These taxes are authorized by *N.J.S.A.* 54:30A–16 *et seq.* and 54:30A–49 *et seq. N.J.S.A.* 54:30A–24, –24.1, –60, –61, and –61.1 provide for the distribution and the apportionment of these revenues as state aid for eligible municipalities. As approved by the Legislature in the Appropriations Act, the appropriation of state aid provided:

> Notwithstanding the provisions of C.54:30A–24.1 and C.54:30A–61.1, public utilities franchise and gross receipts tax payments to those municipalities apportioned pursuant to those sections in an amount in 1982 greater than that received in 1981, shall be limited to an amount equal to that which each such municipality received in 1981 plus an amount equal to 92.221235 percent of the difference between the amount each received in 1981 and the amount each is apportioned in 1982 pursuant to those sections; provided, however, that the

amount not distributed shall be anticipated as revenue for general State purposes. [Senate Bill 1600 at 143, lines 56–65.]

The Appropriations Act as passed also contained the following limitation on the payment of the state aid appropriated by the above language:

Notwithstanding the provisions of C.54:30A–24.1 and C.54:30A–61.1, the payments to municipalities from the public utilities franchise and gross receipts taxes in June, 1983 shall be limited in the aggregate to $140 million in the manner outlined above and any amount collected in excess of this sum shall be anticipated as revenue for general State purposes. [Id. at lines 65A–65F.]

The appropriation at issue basically provides that no more than 92.221235% of the difference between the amount paid in aid in 1981 and the amount to be apportioned in 1982, if the statutory formulas were applied, shall be paid to the local governments. The balance—7.778765%—is not to be paid but instead anticipated by the State as revenue for general state purposes. The Governor used his line-item veto to reduce this percentage (of the difference between the amount paid in 1981 and the amount to be apportioned in 1982) to 67.811935, so as to bring the distribution of gross receipts tax revenue "into conformance with [his] original budget recommendations," according to his message to the Senate. The effect of the Governor's line-item veto in this respect was to reduce the amount of state aid by $27,000,000. The Governor also reduced the aggregate limit on the June 1983 aid payment from $140,000,000 to $125,-000,000. Thus, by changing the percentage and lowering the aggregate limit on the aid payment, the Governor effectively reduced the amount of state aid to the covered municipalities by $32,000,000.[3] The money obtained from these reductions is retained in the General Fund.

---

[3]As passed by the Legislature, it was estimated that the retention of the 7.778765% difference would yield $8,603,594 for the General Fund. Senate Bill 1600 at 4. In the revenue certification included in his line-item veto statement, the Governor certified that the State could anticipate retaining $35,603,594 in 1982 from retention of the local share of public utility taxes. The $27,000,000 difference between $8,603,594 and $35,603,594 is the result of the Governor's line-item veto.

Appellants claim that the state aid provisions contained in the Appropriations Act constitute only conditions or qualifications upon an appropriation. They contend that the statutes providing for the tax on utilities, *N.J.S.A.* 54:30A–24, –24.1, –60, –61, –61.1, constitute the operative appropriations and that the language in the Appropriations Act provides merely a distribution formula for the franchise and gross receipts tax revenues and does not itself constitute an appropriation. The provisions in the Appropriations Act, therefore, are not themselves amenable to the Governor's line-item veto.

We disagree. The Appellate Division ruled, as do we, that the Governor properly employed his line-item veto power when he reduced the amount of state aid to the municipalities from the utilities franchise and gross receipt taxes. 190 *N.J. Super.* at 221.

The two controverted provisions constitute appropriations. They provide the statutory authorization to make expenditures of state funds for state aid to municipalities. Such an authorization clearly constitutes an appropriation of revenues. *E.g., Borough of Glassboro v. Byrne, supra,* 141 *N.J. Super.* at 23; *see Jessen Assocs., Inc. v. Bullock,* 531 *S.W.*2d 593, 599 (Tex. 1976) ("If the language is intended to set aside funds for a specified purpose, it is an 'item of appropriation' and is there-

---

However, it should be noted that the reduction of the aggregate state aid limits from $140,000,000 to $125,000,000 does not necessarily result in an increase in General Fund revenues by $15,000,000. The aggregate amount collected depends on the total utilities bill. Revenue estimates made in the spring, at the time the budget is first proposed, do not always prevail at the time a budget becomes law on July 1. In Senate Bill 1600, the Legislature estimated that the revenue that would be obtained by retaining for the state a portion of the 1983 local share would be $39,400,000. To retain that amount, and gain an additional $5 million that the Governor thought should go toward creating a budget surplus, he reduced the $140 million limit to $125 million. Accordingly, his revenue certification anticipates that the State will retain $44,400,000 in 1983 from the local share. This certification reflects his judgment at the time of signing the budget that, because of the state of the economy, anticipated receipts would decline by $10 million from the amount previously anticipated to make the June 1983 payment.

fore subject to veto by the Governor."); *see also Hopkins v. Ford, supra,* 534 *S.W.*2d at 795 (appropriation is "not so limited as to require fixing dollar amounts in order to validate allocation of surplus revenue").

It is also obvious that the operative statutes imposing the public utilities franchise and gross receipts taxes and providing for their distribution are not themselves appropriations. In *City of Camden v. Byrne, supra,* 82 *N.J.* at 146, we concluded that separate statutes imposing the sales and use tax, the bus franchise replacement tax, and the transfer-inheritance tax, and providing generally for their distribution

> do not constitute legislative appropriations in and of themselves. Additionally, these separate enactments have not been aggregated or included within a single appropriation law encompassing one fiscal year. They cannot serve, therefore, as valid authority for the withdrawal of monies from the State treasury under the State Constitution. [82 *N.J.* at 146.]

Accordingly, the underlying taxing statutes were not considered "self-executing as current appropriations," *id.* at 147, and "[could not] have the legal effect of appropriation laws," *id.* at 150.

Like the three tax statutes considered in *City of Camden v. Byrne,* the public utilities franchise and gross-receipts tax statutes now before us also provide a formula for the distribution and apportionment of those revenues as state aid to eligible municipalities. *N.J.S.A.* 54:30A–24, –24.1, –60, –61, –61.1. It is precisely because these statutory apportionment provisions "do not constitute legislative appropriations in and of themselves," *City of Camden v. Byrne, supra,* 82 *N.J.* at 146, that the Appropriations Act included the specific appropriations implementing the existing law. *Id.* at 150.

Appellants, however, further complain that the Governor's action impermissibly resulted in the transfer of monies from municipalities to the state. It is doubtful that such an asserted effect, even if demonstrable, would serve to invalidate the line-item veto. Moreover, the premise of appellants' argument is dubious. It is difficult to conclude that these revenues are

municipal revenues as such. *See City of Camden v. Byrne, supra,* 82 *N.J.* at 155–56. At any rate, they most certainly qualify as state revenues. In 1980 the Legislature provided that the franchise tax be imposed, assessed, and collected by the state, with the revenues from that tax thereafter paid into the state's General Fund. *L.* 1980, *c.* 10; *L.* 1980, *c.* 11. Further, that same year the Legislature specifically committed these revenues for state aid in the Appropriations Act for fiscal year 1981. *L.* 1980, *c.* 56; see 1981 *Appropriations Handbook* 439. Plainly, the public utilities franchise and gross receipts taxes are state taxes, and the resultant revenues are state revenues.

Appellants also assert that a governor may not invoke his veto power to strike conditions or restrictions on the use of an appropriation without vetoing the accompanying appropriation as well. This assertion, however, is inapplicable here since the challenged provisions constituted direct appropriations and were not conditions or restrictions governing appropriated funds. See discussion *infra* commencing at 502.

In sum, because the provisions relating to state aid to municipalities are appropriations, they are subject to the Governor's line-item veto power. The Governor exercised this power with respect to these appropriations in the most traditional and long-sanctioned sense. His effectuation of a reduction of the state-aid appropriation to eligible municipalities represents precisely the sort of measure that the line-item veto power was intended to permit. *See Blanch v. Cordero,* 180 *F.*2d 856 (1st Cir.1950), *cert.* den. 340 *U.S.* 819, 71 *S.Ct.* 49, 95 *L.Ed.* 601 (1950); *Fitzsimmons v. Leon,* 141 *F.*2d 886 (1st Cir.1944) (Organic Act of Puerto Rico empowers governor to scale down as well as to disapprove items in appropriation bills since governor may object to an item, part, or portion thereof). Each type of appropriation was properly subject to the line-item veto power, and that power was lawfully exercised.

B

 The second challenge to matters concerning appropriated funds is directed to the Governor's veto of a portion of a capital-construction appropriation to the Department of Transportation. As passed by the Legislature, the Appropriations Act contained such an appropriation in the amount of $12,000,-000. Of this amount, $7,000,000 was designated to provide State matching funds for federally-aided interstate highway projects; the remaining $5,000,000 was to fund non-federal highway projects. Senate Bill 1600 at 148–49. The Appropriations Act further provided for the expenditure, out of the total appropriation of $12,000,000, for three particular projects. One related to Route 541, *viz:*

> Funds hereinabove shall be available as matching funds for federal monies derived from the redesignation of I–895 and such funds shall be used to purchase the right-of-way of Route 541. [*Id.* at 149A, lines 78–81.] .

The Governor used his line-item veto to eliminate in its entirety this appropriation to supply matching funds for Route 541. Although the Legislature estimated this expenditure to be $3,000,000, the Governor did not reduce either the lump-sum appropriation of $7,000,000 or the total appropriation of $12,-000,000 by any corresponding amount.

A second authorized expenditure dealt with Laurelton Circle, *viz:*

> Of the amount hereinabove appropriated, $1,000,000 in funds shall be made available for the reconstruction of Laurelton Circle, Ocean County. [*Id.* at lines 70–72.]

The Governor deleted this language in its entirety. He left intact, however, the lump-sum appropriation of $5,000,000 for non-federal highway projects, as well as the total appropriation of $12,000,000 for capital construction, unreduced by the deletion of $1,000,000.

Finally, the Act contained a specific appropriation for a bridge across Overpeck Canal, *viz:*

> Of the amount hereinabove appropriated, $700,000 shall be made available for construction of a vehicular bridge across Overpeck Canal in the vicinity of

Cedar Lane and Sheffield Avenue, Englewood, with access road to Route 4. [*Id.* at lines 73–77.]

The Governor utilized his line-item veto power to reduce the $700,000 recommended appropriation to $70,000, a difference of $630,000. However, he did not reduce by this amount either the sub-total appropriation of $5,000,000 or the total appropriation of $12,000,000.

Appellants argue that the "executive's item veto power may be used only to nullify the whole or part of an item of appropriation of money by eliminating or reducing it and then returning the amount eliminated or reduced to the State General Fund as surplus revenue." The Appellate Division agreed, holding that striking these items of appropriation without lowering the overall appropriations subverted the legislative intent and was an improper "affirmative" use of the line-item veto. It concluded that the three portions "of the appropriations vetoed by the Governor were conditions upon which the [larger] appropriations were made, and thus could not be deleted or otherwise changed without a corresponding change in the amount of the general appropriation." 190 *N.J.Super.* at 229 (citations omitted).

We disagree with this determination. The Governor's action fully conformed to the provisions of the constitutional line-item veto clause. *N.J. Const.* (1947) art. V, § I, para. 15. In its traditional sense, a "line-item" is defined as "[a]ny single line account for which an appropriation is provided in an Appropriations Act." *Budget Message of Governor Kean,* March 15, 1982, Glossary 22b; *accord Brown v. Firestone,* 382 *So.*2d 654, 668 (Fla.1980) (an appropriation is the "smallest identifiable fund to which a qualification or restriction is or can be directly and logically related").

Courts in other jurisdictions that have specifically considered this issue in the context of similar constitutional provisions for a gubernatorial line-item veto power have upheld the executive's right to reduce or eliminate specific appropriations without reducing by a like amount the total appropriation in which

the specific item is included. *E.g., Reardon v. Riley,* 10 *Cal.*2d 531, 76 *P.*2d 101 (1938); *Green v. Rawls,* 122 *So.*2d 10 (Fla. 1960); *State ex rel. Brotherton v. Blankenship,* 158 *W.Va.* 390, 214 *S.E.*2d 467, 481–83 (1975). In *Reardon v. Riley,* the court expressly ruled that the governor's refusal to make a corresponding reduction in a total appropriation equal to the reduction of a lesser-included appropriation does not constitute an unlawful "affirmative" use of the constitutional veto power. By upholding this exercise of the line-item veto power, the court reasoned that it not only gave full effect to the intent of the legislature, but also preserved the governor's power to reduce or eliminate items of appropriation, as well as to approve them. Thus, although the legislature intended to authorize the total appropriation "regardless of the subsequent fate of the specific and included items of further appropriation," the governor could properly reduce that total by an amount less than the sum of the vetoed included items. *Reardon v. Riley, supra,* 10 *Cal.*2d at 536, 76 *P.*2d at 103. Such action on the part of the governor, in the court's opinion, did not

improperly increase an appropriation without legislative action, nor did it constitute an unauthorized veto of conditional or provisional language used in connection with the specific and included items of appropriation. It was an 'elimination' of the specific and included items and a reduction of the general and inclusive item of appropriation. Such a conclusion appears to effectuate the intent of the Legislature without depriving the Governor of the full effect of the veto power granted him. [*Id.* 76 *P.*2d at 104.]

*See also* Beckman, "The Item Veto Power of the Executive," 31 *Temp.L.Q.* 27, 32 (1957) (noting conflict of authority whether power to veto separate items or parts of items of appropriation bill confers authority to change amount of a single item).

The result espoused by the Appellate Division in the instant case—disallowing the deletion of an included appropriation without a corresponding reduction of the total appropriation— would too easily permit the Legislature to circumvent the Governor's line-item veto power and upset the system of checks and balances that must operate in the budget-making arena. For example, in *People ex rel. State Bd. of Agriculture v.*

*Brady,* 277 *Ill.* 124, 115 *N.E.* 204 (1917), the legislature adopted a lump-sum appropriation followed by subdivisions calling for the expenditure of the lump-sum in specified amounts for enumerated purposes. The legislature argued that the governor could not item-veto one of the subdivisions without vetoing the total, asserting that the subdivisions constituted qualifications upon the overall appropriation. The court held that to find the whole bill constituted but one item would effect a legislative evasion of the governor's authority to veto distinct items.

We conclude that the Governor properly exercised his line-item veto power to eliminate two appropriations and reduce a third appropriation for particular highway projects consisting of parts of the total appropriation designated for capital construction by the Department of Transportation. This action fully conforms to his constitutional authority to reduce or eliminate items of appropriation. At the same time, the Governor lawfully exercised his constitutional authority not to reduce the larger capital construction appropriations of $7,000,000 and $5,000,000, respectively, or the total appropriation of $12,000,-000. His determination not to disturb the larger appropriation was within his constitutional prerogative to approve portions of appropriations bills.

## IV

Appellants' other major challenges to the Governor's veto relate to the application of the line-item veto power to certain general provisions in the Appropriations Act. These provisions, relating to various aspects of governmental operations, were vetoed by the Governor as violative of constitutional standards. Appellants assert that these general provisions are not appropriations *per se* and, further, comprise general restrictions that are constitutional and therefore not subject to the line-item veto. Another provision, relating to the purposes of a capital construction project in the Department of Corrections, was

similarly challenged before the Appellate Division, which, although no longer at issue, we determine to address.

A

Appellants originally challenged the Governor's deletion of nine paragraphs in the Appropriations Act, asserting that his action was outside the line-item veto authority. According to the Attorney General, the Legislature had inserted several provisions in the Appropriations Act intending to condition and direct the manner in which the Governor is to execute state programs funded by items of appropriations contained in the budget. Some of these legislatively-imposed conditions were integrally and permissibly tied to specific items of appropriation in the Act. Other provisions, however, were not ostensibly tied to any particular appropriation. As argued by the Attorney General, they purportedly placed specific restrictions on the way in which the executive branch administers particular areas of the state government on a day-to-day basis, in matters in which the executive traditionally and properly exercises broad discretion. The Governor's position is that the nine paragraphs injected into the Appropriations Act were constitutionally offensive because they violated the doctrine of separation of powers, the prohibition against the delegation of the whole of the Legislature's power to just a few of its members, the requirement that a bill be devoted to a single object, and the principle that a permanent law may not be amended by reference only to its title.

The Governor exercised his line-item veto power by deleting these provisions. On appeal before the Appellate Division, appellants challenged only three of the vetoes. Before this Court they challenge only two of the vetoes.[4] With the excep-

---

[4]The provision challenged in the Appellate Division but no longer contested in the appeal was numbered 35 on page 173 of Senate Bill 1600. It provided

The Director of the Division of Budget and Accounting is hereby authorized to review the total complement of positions now maintained among the

tion of these, they do not contest the Governor's veto of the other provisions. The Appellate Division ruled that the nine provisions as a whole "would have infringed unconstitutionally upon the Governor's day-to-day administration of government," and that they violated the doctrines of bicameralism and separation of powers. 190 *N.J.Super.* at 210. On these grounds, the court upheld the governor's veto.

■ The statutory paragraphs that appellants continue to assert still survive the Governor's line-item veto are numbered 36 and 47. Paragraph 36 provides:

> As of July 1, 1982, all full-time salaried vacant authorized, special services and temporary positions supported by the funds hereinabove appropriated, exclusive of those positions in the Legislature, the Office of the Chief Executive and the Judiciary, are abolished. [Senate Bill 1600 at 173, ¶ 36.]

Paragraph 47 states:

> If, as a result of an insufficiency of appropriations in any program account, it is required or determined that there will be a reduction in the number of State offices, positions or employees in that program account, the head of the department which administers the program shall effect that reduction in personnel from among all offices, positions or employment at salaries which exceed $15,000.00 in the unclassified service of the civil service before effecting any reduction in personnel from the classified service. [*Id.* at 175, ¶ 47.]

As noted, the Attorney General argued successfully before the Appellate Division that the Legislature's attempt, through paragraph 36, to control the elimination of particular positions in the executive branch usurps and interferes with the Governor's constitutional responsibility for administering the executive branch of government. This intrusion upon constitutional executive prerogatives was found to violate the doctrine of separation of powers.

---

various Executive Departments and abolish 2,500 vacant budgeted positions exclusive of those positions that are vital to the safety and health of the residents in our State institutions, the State Police, or other critically important functions of the government. [Senate Bill 1600 at 173, ¶ 35.] The entire text of the nine provisions originally challenged are set forth *verbatim* in the Appellate Division opinion. 190 *N.J. Super.* at 208 n. 4.

■

The Attorney General also persuaded the Appellate Division that paragraph 47 violates both the doctrine of separation of powers and the single-object clause of the Constitution. By generally mandating that all unclassified positions be eliminated before there can be any reductions in the classified service, the provision arguably offends the doctrine of separation of powers, insofar as its application would severely hamper the Governor's discretion in the efficient administration of government. In addition, according to the Attorney General, the single-object clause is violated. The establishment of authority to regulate the manner of layoffs of state employees for reasons of economy, it is argued, involves a subject matter other than, and not merely incidental to, the allocation of revenue or the regulation of the State's spending program.

We affirm the judgment of the Appellate Division with respect to its sustaining the Governor's line-item veto of paragraphs 36 and 47. We do not, however, predicate our conclusion on the reasoning of the Appellate Division in reaching this result. It may be that these particular provisions offend relevant constitutional doctrine, as argued by the Attorney General and determined by the Appellate Division. *See, e.g., Enourato v. New Jersey Bldg. Auth.*, 90 *N.J.* 396 (1982); *General Assembly of New Jersey v. Byrne*, 90 *N.J.* 376 (1982). Nevertheless, we need not determine whether a constitutional deficiency of this kind is necessary to invoke or validate the Governor's constitutional power to veto general conditions as items in an appropriations act. The primary standard for determining if the line-item veto authority is properly exercised turns on whether the subject matter is included in the appropriations act and whether the subject is intended to be covered by the constitutional line-item veto power in terms of its relationship to the appropriations made and expenditures authorized by the act.

In this case, both paragraphs 36 and 47 were included within the Appropriations Act. However, these provisions, separately

considered, are not themselves an appropriation of funds, that is, an authorization that state funds be spent for a particular purpose. They do not *per se* constitute an appropriation or an item of appropriation, at least in the most restrictive and narrow sense of these terms. *See, e.g., Brown v. Firestone, supra,* 382 *So.*2d at 668; *Jessen Assocs., Inc. v. Bullock, supra,* 531 *S.W.*2d at 599. Rather, these provisions may, more broadly, be regarded as limitations, restrictions, or conditions on the expenditure of appropriated monies. It is of course entirely possible that a proviso or condition may be utterly extraneous to the appropriations contained in an appropriations act. *See, e.g., Bengzon v. Secretary of Justice,* 299 *U.S.* 410, 414–15, 57 *S.Ct* 252, 254, 81 *L.Ed.* 312, (1937) ("An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill."); *see also* Givens, "The Validity of a Separate Veto of Nongermane Riders to Legislation," 39 *Temp.L.Q.* 60, 63 (1965) ("[A] piece of substantive legislation attached to an appropriation act might be deemed an unrelated rider if it had nothing to do with the appropriations authorized."). Nevertheless, it is inaccurate to conclude that because they constitute "general conditions," the provisions still challenged in this appeal are unrelated to any appropriation.

Paragraph 36 purports to authorize the abolition of vacant positions supported by appropriated funds. The obvious, albeit indirect, consequence of this condition, if effectuated, is the avoidance of expenditures of appropriated funds for the particular positions, and the resultant transfer of a proportionate amount of the appropriated monies into the General Fund for state purposes.[5] Paragraph 47 deals with the particular conse-

---

[5]Similarly, paragraph 35, the veto of which is no longer contested, authorizes the Director of the Division of Budget and Accounting to abolish certain vacant budgeted positions. As such it is a general condition, comparable to paragraph 36, that affects the subject matter of appropriations. Its indirect effect would

quences attendant upon an insufficiency of funds appropriated for "any program." In effect, it is a limitation or condition subsequent triggered or effectuated by the expenditure of appropriated monies that results in the insufficiency of funds to carry on programs for which appropriations were made.

As a condition or limitation on the expenditure of appropriated funds, each of these provisions is generally tied or sufficiently related to the appropriations made by the Appropriations Act. As such, they properly have been included in the Act. *See State ex rel. Turner v. Iowa State Highway Comm'n*, 186 *N.W.*2d 141, 148–50, 153 (Iowa 1971) (for purposes of exercise of line-item veto a general condition may be sufficiently related to an appropriation when its effectuation entails the use of other appropriated funds); *cf. Green v. Rawls, supra*, 122 *So.*2d at 16 (provision constitutes "item" regardless of its inclusion within larger, more general item if it relates to any detail or particular of matters treated in appropriation bill and if it specifies amount and purpose for expenditure).

Further, if there be any doubt as to whether such provisions are intended to be related to appropriations as general conditions on the expenditure of appropriated funds, that doubt must be resolved in favor of a legislative purpose to effect such a connection or relationship. We must assume that the Legislature intended to act constitutionally. *See, e.g., Right to Choose v. Byrne*, 91 *N.J.* 287, 311 (1982); *New Jersey Ass'n on Correction v. Lan*, 80 *N.J.* 199, 218 (1979). If the Legislature included provisions that were totally alien to the central subject of the appropriations law and completely divorced from either the appropriations of funds for state purposes or the manner in which appropriated monies are to be spent, such action would most certainly be in constitutional jeopardy. *See N.J. Const.*

be to bar the expenditure of appropriated funds for particular purposes with a concomitant increase in the General Fund.

(1947), Art. IV, § 7, par. 4; *New Jersey Ass'n on Correction v. Lan, supra,* 80 *N.J.* at 215. Thus, the fact that the Legislature has included such provisos in the Appropriations Act itself can, in the absence of totally preclusive language dictating a contrary conclusion, be determinative of an implied intention to relate such conditions to the appropriations contained in the Act. It is fair to presume that the Legislature, by including such conditions, intended to act constitutionally in exercising its fiscal power over appropriations and that such conditions were intended to relate to and govern the expenditure of appropriated funds.

■ It follows, in terms of the constitutional scheme, governmental policy, and plain logic, that such general conditions, limitations, or restrictions found in an appropriations act can be the discrete subject of the gubernatorial line-item veto. The validity and propriety of the procedure followed by the Governor in this case is illuminated when viewed against the backdrop of the appropriations process. The constitutional framework, as noted, mandates that state government be financed through a single, balanced appropriations act covering the entire fiscal year. See discussion, *supra,* at 488. The constitutional plan has carefully orchestrated the roles of the popular branches of government, meticulously structuring their interactions in the fashioning of the State budget. This process invokes the authority and cooperation of both the Legislature and the Executive.

■ The constitutional line-item veto power serves the governmental need to have a balanced budget in place at the start of the fiscal year. *Supra* at 489. It reflects a realistic appreciation of the fiscal and operational exigencies that attend the striking of the State's budget. *See Opinion of the Justices,* 384 *Mass.* 828, 428 *N.E.*2d 117, 120 (1981) ("[I]f through the appropriation process, the Legislature were able to compel the Governor either to accept general legislation or to risk forfeiture of appropriations for a department of government, the

careful balance of powers struck in [the state constitution] would be destroyed, and the fundamental principle of separation of powers * * * would be substantially undermined."). For that fundamental reason, in the budget-making function the Governor is not remitted to the use of only the absolute or conditional veto. The Governor is empowered to make selective reductions or eliminations of appropriations and discrete elements or parts of included appropriations that he deems excessive, unwise, improper, unlawful, or unconstitutional. This authority reasonably is to be implied in order to avoid a stalemate with the Legislature that would arise if the Governor were otherwise required either to veto the entire statutory appropriation or to suffer the nullification of his own constitutional responsibility.

In our opinion, the selective veto power may be exercised with respect to any subject matter that is included in the appropriations act and is broadly related to the State's fiscal affairs as reflected in the Act. *State ex rel. Turner v. Iowa State Highway Comm'n, supra*, 186 *N.W.*2d 141; *Opinion of the Justices*, 384 *Mass.* 820 at 826, 425 *N.E.*2d 750 at 754 (1981) (to maintain constitutional balance and preserve separation of powers, gubernatorial partial veto power must extend to any separable provisions contained in general appropriation bill); *State ex rel. Sego v. Kirkpatrick*, 86 *N.M.* 359, 365, 524 *P.*2d 975, 981 (1974) (partial veto power extended or enlarged to cover bills of general legislation, which contain incidental items of appropriation, as well as general appropriation bills, and to cover "items or parts" thereof in addition to "items of appropriation"); *State ex rel. Brown v. Ferguson*, 32 *Ohio St.*2d 245, 251, 291 *N.E.*2d 434, 438 (1972) (those provisions in appropriation bill that are separate and distinct from other provisions in same bill, insofar as subject, purpose, or amount of appropriation is concerned, constitute "items" subject to gubernatorial veto); *State ex rel. Sundby v. Adamany*, 71 *Wis.*2d 118, 134, 237 *N.W.*2d 910, 918 (1976) (item veto of governor valid in that portions vetoed, although not actually items of appropriation,

were separable provisions, not constituting provisos or conditions to an item of appropriation, and remaining portions constituted a complete and workable law). This executive power would encompass general and broad conditions affixed to the expenditure or use of appropriated funds.

Furthermore, the exercise of this power on general conditions in this case is not contrary to the language of the line-item veto clause itself. Fairly read, that clause empowers the Governor to object not only to an item of appropriation "in whole" but also to "part" of an appropriation. *N.J. Const.* (1947) art. V, § I, para. 15. The constitutional choice of language was obviously premised on the expectation that only items of appropriation of money, or conditions on their expenditure, would be included in a general appropriations act. The Governor is thus authorized by the constitutional clause to object "in whole or in part" to any item of appropriation; consequently, any item or "part thereof" that has been subject to the Governor's objection shall be ineffective. Construing this language sensibly, to accord with the constitutional scheme, we are satisfied that a general condition on appropriated funds may itself be regarded as a "part" of an appropriation. Consequently, such conditions are within the ambit of the Governor's line-item veto power and may be eliminated without necessarily and simultaneously eliminating or reducing any specific item of appropriated funds.

We are aware of authority that supports the reasoning of the Appellate Division that such a condition when not related to a specific item of appropriation can be vetoed if the condition is otherwise unconstitutional. *E.g., Henry v. Edwards,* 346 *So.*2d 153, 162 (La.1977) (court upheld governor's deletion of language in general appropriations act calling for legislative review of monies spent and of prisoner transfers on grounds such language violated single object and special legislation principles). However, we need not in this case determine whether the constitutional line-item veto clause necessarily requires this expansive interpretation in order to fulfill its essential purpose and vindicate its underlying intent.

■ We are satisfied that the Governor had the constitutional authority pursuant to his line-item veto power to delete these general provisions because they are sufficiently related to the appropriations that they purport to condition. Hence, the veto of these provisos is committed to the broad discretion of the Governor without regard to whether they were otherwise unlawful or unconstitutional.

## B

Another general condition was included with the appropriation of $13,325,000 to the Department of Corrections to fund its correctional capital construction program. Following that appropriation, the Appropriations Act provided:

> The Department of Corrections is prohibited from placing a new correctional facility in a county with a population exceeding 85,000 but less than 100,000 in which another State correctional facility is located. [Senate Bill 1600 at 145, lines 9–13.]

The Governor eliminated this language in its entirety. The deleted paragraph would have prohibited the construction of a new correctional facility only in Hunterdon County, since that is the only county in the State that meets the criteria of the provision. The appellants no longer challenge this result. Nevertheless, the matter was fully briefed and argued before the Appellate Division, which rendered a decision. Because the issue raised by this challenge is important, capable of recurrence, and was disposed of by the court below on grounds that necessitate our consideration, we have decided to deal with the meritorious issue. *See, e.g., State v. Union Co. Park Comm'n,* 48 *N.J.* 246, 248–49 (1966).

■ It is asserted that this purported limitation on the executive's discretion to establish the siting of necessary state correctional facilities is not tied to any particular item of appropriation. As with other provisions containing general conditions or limitations, the Governor concluded that such language offended several constitutional principles, namely, separation of powers, the prohibition against special legislation,

the single-object clause, and the prohibition against amending a law by reference only to its title. These reasons impelled his veto of the provision.

The Appellate Division determined that this paragraph was not tied to any particular appropriation under the budget and that it would more properly be the subject of a conventional bill. 190 *N.J. Super.* at 224. Accordingly, the court concluded that inclusion of the language was unconstitutional and, for that reason, it sustained the Governor's veto. *Id.* at 231.

We do not agree that this provision is unrelated to the particular appropriation for the construction of correctional facilities. *See State ex rel. Turner v. Iowa State Highway Comm'n, supra,* 186 *N.W.*2d 141. We consider the proviso to be a part of the capital construction appropriation for the Department of Corrections. The provision serves to define or specify the purpose of the appropriation and is, in reality, a condition on the expenditure of the appropriated sums. By virtue of this condition, the Legislature, in effect, appropriated $13,325,000 to the Department of Corrections for the construction of a correctional facility anywhere in the state except in Hunterdon County. The provision, thus understood, relates to the purpose of the particular appropriation. The Governor's veto of this exception constitutes the veto of "part" of an item of appropriation, which he is empowered to assert under the line-item veto clause of the Constitution. *Supra* at 509.

Consequently, we affirm this result, although for purposes of this opinion we do not rely on the reasoning of the Appellate Division. As already determined, the line-item veto power does not depend for its exercise on a determination that the subject matter violates constitutional provisions or is otherwise unlawful. Rather, as we have ruled, it depends primarily on whether the subject matter constitutes an appropriation or an item of appropriation or is in any way related to appropriations or the expenditure of appropriated sums. *Supra* at 508–509.

## V

For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the Appellate Division. So ordered.

*For affirmance in part; reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI join in this opinion.

*Opposed* —None.