NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1537-21

CARGILL MEAT SOLUTIONS,
CORP.,

      Plaintiff-Appellant,

v.

DIRECTOR, DIVISION OF
TAXATION,

      Defendant-Respondent.

_____

<table>
<tr><td>

**APPROVED FOR PUBLICATION**

**October 12, 2023**

**APPELLATE DIVISION**

</td></tr>
</table>

Argued September 13, 2023 – Decided October 12, 2023

Before Judges Currier, Firko, and Susswein.

On appeal from the Tax Court of New Jersey, Docket No. 8146-2018, whose opinions are reported at 31 N.J. Tax 506 (Tax 2020) and 32 N.J. Tax 429 (Tax 2021).

Kyle O. Sollie argued the cause for appellant (Reed Smith LLP, attorneys; Kyle O. Sollie and Matthew L. Setzer, on the briefs).

Joseph A. Palumbo, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Melissa Raksa, Assistant Attorney General, of counsel; Jean P. Reilly, Assistant Attorney General, and Joseph A. Palumbo, on the brief).

Dakessian Law, Ltd, attorneys for amicus curiae New Jersey Business & Industry Association (Michael P. Penza, on the brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

This appeal involves the Clean Communities Program Act (the Act), N.J.S.A. 13:1E-213 to -223, which imposes a tax on the sale of litter-generating products in this state involving manufacturers, wholesalers, distributors, and retailers. Plaintiff Cargill Meat Solutions Corporation (Cargill), a Delaware corporation, headquartered in Kansas, manufactures litter-generating packaged meat products, which it distributes throughout the country. Cargill stores and distributes meat products through its Swedesboro facility.

N.J.S.A. 13:1E-216 exempts from the tax "sale[s] by a wholesaler or distributor to another wholesaler or distributor" (the wholesaler-to-wholesaler exemption). Cargill filed tax returns in 2014 and 2015 applying the wholesaler-to-wholesaler exemption. Defendant Director of Division of Taxation (Division) audited Cargill's tax returns for the years at issue and issued a final determination finding Cargill was ineligible for the wholesaler-to-wholesaler exemption. In 2018, Cargill filed a complaint in the Tax Court contending it was not subject to the tax for the years at issue because the

Legislature did not specifically appropriate the revenue generated by the Clean Communities Program Fund (the Fund) pursuant to the Act.

The Division moved to dismiss that count. In Cargill Meat Solutions Corporation v. Director, Division of Taxation (Cargill I), 31 N.J. Tax 506 (Tax 2020), Judge Mark Cimino granted the Division's motion and found the Legislature could rely on N.J.S.A. 13:1E-217 ("General Provision 2"), as referenced in N.J.S.A. 13:1E-233 ("Appropriations Act"), to appropriate the revenues generated by the Fund pursuant to the Act.

In 2020, Cargill moved for summary judgment arguing it qualified for the wholesaler-to-wholesaler exemption in the Act. The following year, the Division cross-moved for summary judgment seeking to dismiss the remaining counts of Cargill's complaint with prejudice. In Cargill Meat Solutions Corporation v. Director, Division of Taxation (Cargill II), 32 N.J. Tax 429 (Tax 2021), the judge denied Cargill's motion for summary judgment and granted the Division's cross-motion finding Cargill was not eligible for the wholesaler-to-wholesaler exemption.

Cargill appeals from the March 12, 2020 order dismissing the second count of its complaint and the December 15, 2021 order denying its motion for summary judgment and granting the Division's cross-motion for summary judgment. Based upon the applicable legal principles, we affirm both orders,

substantially for the reasons expressed by Judge Cimino in his well-reasoned opinions.

## I.

## Background

Cargill maintains a 26,000 square foot freezer and cooler in Swedesboro. Cargill's activities in New Jersey are limited to only selling its products. Cargill does not conduct any manufacturing in this state. Cargill's products are sold in disposable packages, such as styrofoam and plastic wrap. Approximately 99.8% of Cargill's sales in New Jersey are to wholesalers and 0.2% are to retailers.

In 2014, Cargill claimed $1,276,738 of its $466,561,978 gross receipts qualified for the wholesaler-to-wholesaler exemption under the Act. In 2015, Cargill claimed $654,330 of its $509,985,131 gross receipts qualified for the exemption. Cargill posited these sales were not subject to the tax. Instead, based on its calculations, Cargill claimed it owed $393 in 2014, and $196 in 2015. Following the Division's audit of Cargill's 2014 and 2015 tax returns, the Division rejected Cargill's eligibility for the wholesaler-to-wholesaler exemption because Cargill was a manufacturer of its products. The Division increased Cargill's gross receipts to correspond with its corporate business tax

returns. Thus, the Division determined Cargill owed $160,348.92 for 2014, and $155,389.11 for 2015, for a total of $315,738.03 in taxes plus interest.

On July 26, 2016, following the audit, the Division issued a notice of assessment with associated penalties and interest totaling $350,365.88. Cargill protested the amount. In response, an administrative conference was held in November 2017, and the Division recalculated the tax assessment using Cargill's proposed methodology to $302,735.55, excluding penalties and interest. In February 2018, the Division issued a final determination revising Cargill's total liability to $371,524.83, including penalties and accrued interest. To date, Cargill has not paid its 2014 and 2015 litter tax fees.

## Cargill I

In May 2018, Cargill appealed the Division's final determination to the Tax Court. Cargill argued: (1) the Division improperly denied its eligibility under the wholesaler-to-wholesaler exemption (count one); (2) the monies in the Fund were appropriated outside the Annual Appropriations Act, violating the Appropriations Clause of the New Jersey Constitution (count two); (3) the Division's final determination disproportionately burdens Cargill (count three); (4) the tax violates the Commerce Clause of the United States Constitution (count four); (5) the tax violates the Due Process Clause of the United States Constitution (count five); and (6) Cargill is entitled to reasonable attorney's

fees (count six). The Division filed an answer and later moved to dismiss count two of the complaint.

In its dismissal motion, the Division contended Cargill's claim that the Legislature failed to appropriate the monies from the Fund is contrary to the appropriation principles espoused in Camden v. Byrne, 82 N.J. 133 (1980), and Karcher v. Kean, 97 N.J. 483 (1984). Even if the Legislature did not appropriate the monies, the Division argued Cargill still could not prevail because Cargill could not seek retroactive relief for fiscal years 2014 and 2015. According to the Division, N.J.S.A. 13:1E-223, which Cargill relied on in support of its claim, only applies to situations where monies in the Fund have been diverted to an unrestricted fund, which did not occur here. And, the Division asserted if N.J.S.A. 13:1E-223 applied, it was unconstitutional.

In opposition, Cargill asserted it is a wholesaler; the Act exempts wholesale sales to other wholesalers; and it should not be deemed a taxpayer "in the first instance." Cargill also asserted the appropriation was done for the "first few years" pursuant to the Appropriations Act, but then the Legislature "for whatever reason stopped." Cargill disagreed that General Provision 2 of each annual Appropriation Act could not be used as a justification to appropriate the monies here, and the Legislature did not properly appropriate

the tax revenues. Consequently, Cargill argued the tax assessment must be vacated.

Judge Cimino conducted oral argument and reserved decision. On March 12, 2020, the judge published an opinion[1] accompanied by an order granting the Division's motion to dismiss the second count of the complaint. In its opinion, the judge cited the legislative intent of the Act:

> The Legislature finds that an uncluttered landscape is among the most priceless heritages which New Jersey can bequeath to posterity; that it is the duty of government to promote and encourage a clean and safe environment; that the proliferation and accumulation of carelessly discarded litter may pose a threat to the public health and safety; that the litter problem is especially serious in a [s]tate as densely populated and heavily traveled as New Jersey; and that unseemly litter has an adverse economic effect on New Jersey by making the [s]tate less attractive to tourists and new industry and residents.
>
> [Cargill I, 31 N.J. Tax at 512-13 (quoting N.J.S.A. 13:1E-214).]

The judge explained the Act established a "user fee" under N.J.S.A. 13:1E-216(a) based on sales of "litter-generating products in the state at the rate of 3/100th of 1% for manufacturers, wholesalers and distributers, and 2.25/100th of 1% for retailers," exempting retailers with less than $500,000 in annual sales. Id. at 513. The judge stated the user fees are deposited into the

---

[1] Cargill I, 31 N.J. Tax at 506.

Fund, which is located in the Department of Treasury. N.J.S.A. 13:1E-217.

Ibid. The judge outlined the appropriations that are to be made annually from

the Fund pursuant to the Act:

> $375,000 is to be provided to an organization under contract with the Department of Environmental Protection [(DEP)] to provide a public information program with $75,000 utilized exclusively to finance an annual statewide television, radio, newspaper and media campaign promoting anti-littering. N.J.S.A. 13:1E-217(f). The balance in the fund is to be used each year for litter pickup and removal, adopt-a-highway programs, enforcement and public education, and distributed as follows:
>
>> 50% to municipalities with 200 or more total housing units, with the monies divided solely on the proportion of housing units in each municipality;
>>
>> 30% to municipalities with 200 or more housing units, with the monies divided solely on the basis of road mileage;
>>
>> 10% to the counties divided solely on the basis of county road mileage;
>>
>> 10% to the [s]tate for litter control and enforcement.
>
> Id. at 513-14.

The judge explained the Act states:

> Unless otherwise expressly provided by the specific appropriation thereof by the Legislature, which shall take the form of a discrete legislative appropriations act and shall

not be included within the annual appropriations act, all available moneys in the . . . Fund shall be appropriated annually solely for the following purposes and no others . . . .

Id. at 514.

The judge then highlighted that the Legislature implemented a "poison pill to prevent the fees collected from being used by a future legislature for other purposes." Ibid. That provision states:

> The annual appropriations act for each [s]tate fiscal year shall, without other conditions, limitations or restrictions . . . appropriate the amount specified [to the DEP for use by the organization under contract with the department pursuant to N.J.S.A 13:1E-218]; and . . . appropriate the balance of the . . . Fund [to the municipalities, county and [s]tate as set forth in N.J.S.A. 13:1E-217(a) through (d)].
>
> [N.J.S.A. 13:1E-223(a).]
>
> [I]f the requirements [that the money is appropriated as set forth above] are not met on the effective date of an annual appropriations act for the [s]tate fiscal year . . . the Director of the Division of Budget and Accounting [(OMB)] in the Department of the Treasury shall, not later than five days after the enactment of the annual appropriations act . . . that violates any of the requirements of [how the monies are to be disbursed], certify to the Director of the Division of Taxation that the requirements . . . have not been met.
>
> [N.J.S.A. 13:1E-223(b).]

Following the OMB Director's certification, the user fee "shall be without effect on or after the tenth day" pursuant to the Act. N.J.S.A. 13:1E-216(h).

Judge Cimino continued his analysis by stating the expenditures of the Fund were specified as appropriated revenue rather than budgeted revenue, meaning "the [A]ppropriation [A]cts have language that commit the funds without setting forth a specific amount." Cargill I, 31 N.J. Tax at 518. For each Appropriations Act, the judge noted there is both a specific and general provision "which commit the litter fees deposited into the [Fund]." The specific appropriation provision states:

> Notwithstanding the provisions of [N.J.S.A. 52:34-6] or any other law to the contrary, monies appropriated to the [(DEP)] from the . . . [F]und shall be provided by the department to the New Jersey Clean Communities Council [(CCC)] pursuant to a contract between the department and the . . . [CCC] to implement the requirements of the Clean Communities Program pursuant to subsection d. of section 6 of [N.J.S.A. 13:1E-218].
>
> [Id. at 519 (quoting L. 2013, c. 77, § 1 at 611; L. 2014, c. 14, §1 at 148; L. 2015, c. 63, § 1 at 367).]

The judge noted that while the specific appropriation provision states the CCC administers the statewide public information campaign, the Act states the DEP would choose the organization to administer it. Ibid. Cargill does not challenge which organization ought to administer the statewide campaign, but the judge found "this specific provision demonstrates the power of a current

10

legislature to suspend a previously enacted law for the duration of an annual appropriations act."  Ibid.

Relevant to the matter on appeal, General Provision 2 indicates:

> All dedicated funds are hereby appropriated for their dedicated purposes. There are appropriated, subject to allotment by the [OMB] Director . . . and with the approval of the Legislative Budget and Finance Officer, private contributions, revolving funds and dedicated funds received, receivable or estimated to be received for the use of the [s]tate or its agencies in excess of those anticipated, unless otherwise provided herein. The unexpended balances at the end of the preceding fiscal year of such funds, or any portion thereof, are appropriated, subject to the approval of the [OMB] Director. . . .
>
> [L. 2013, c. 77, § 2 at 261:35; L. 2014, c. 14, § 2 at 264:1; L. 2015, c. 63 § 2 at 269:2.]

The judge noted there is no dispute that the CCC received the $375,000 each year, and that the monies "were essentially distributed to the municipalities, counties and [s]tate for litter reduction programs" pursuant to the Act.  Cargill I, 31 N.J. Tax at 519.  However, the judge emphasized the issue is whether there was proper appropriation or command of the Legislature to distribute the "bulk of the funds."  Id. at 520-21.  Cargill argued the Executive branch was distributing the funds without the Legislature's approval.

The judge held that Cargill "wants the court to jump into the treacherous crosscurrents of state-house policymaking, and suspend the litter fee despite

11

apparent legislative and executive acquiescence to its collection and disbursement." Id. at 522. The judge found the Legislature and Executive branch were "on the same page" regarding the Fund's collection and disbursement. The judge stated the "Legislature can adjust or eliminate dedicated funds each year as it goes along," promoting stability in governmental decision-making. Id. at 524-25. While detailing how funds should be budgeted every year may add more transparency to the budgetary process compared to General Provision 2, the judge held "how to express the rededication of funds is a matter of legislative policy." Id. at 525.

The judge found the Fund is a "dedicated fund," which tracks the language of General Provision 2, which indicates "[a]ll dedicated funds are hereby appropriated for their dedicated purposes." Id. at 520. The judge distinguished the current matter from Camden, 82 N.J. at 141-42, because in that case, dedicated funds were used for other purposes. Id. at 526. Here, in contrast, the funds were appropriated for litter control activities. The judge concluded that the Legislature could rely on General Provision 2 to appropriate the Fund pursuant to the Act and did not rule on the constitutionality of the poison pill. Id. at 527.

Cargill II

On November 12, 2020, Cargill moved for summary judgment, and the Division cross-moved for summary judgment seeking to dismiss the remaining counts of the complaint with prejudice. Cargill contended it qualified for the wholesaler-to-wholesaler exemption in the Act, claiming it was "both the manufacturer and the wholesaler." Cargill noted it is not engaged in the business as a manufacturer in this state but is only a wholesaler. Cargill interprets the Act as a "two-level tax," meaning the two taxable transactions are the wholesale and the retail sale.

In opposition, the Division contended Cargill is a manufacturer in this state and not exempted under the Act. The Division claimed Cargill manufactures litter-generating products and transports, stores, and sells those products in New Jersey. Although the Act does not define "manufacturer," the Division pointed to a regulation defining "manufacturer" as someone that "makes the product regardless of whether the manufacturing activities occurs inside or outside New Jersey." See N.J.A.C. 18:38-1.3. The Division highlighted the regulation defines a wholesaler as someone that does not include a manufacturer. The Division contended if one is a manufacturer, one cannot be a wholesaler under the Act. Rather, the Division claimed if one considers itself both a manufacturer and a wholesaler, then the manufacturer

13

designation applies to the tax. On April 16, 2021, Judge Cimino heard oral argument on the motions and reserved decision.

On December 15, 2021, the judge published an opinion accompanied by an order denying Cargill's motion for summary judgment and granting the Division's cross-motion for summary judgment. Cargill II, 32 N.J. Tax at 442. The judge found if it were to accept Cargill's argument that its sales to wholesalers are exempt from the tax, then the word "manufacturer" in the Act would become a "nullity" because "any manufacturer of products could claim that it is also a wholesaler," invoking the exemption. Id. at 434. The judge highlighted that the Legislature intended for manufacturers to be subject to the tax because "their sales were included as being subject to the litter fee" and "their sales were not included as part of an exemption." Id. at 435.

The judge found the Act has three levels of taxation: "(1) manufacturers; (2) wholesalers/distributors; and (3) retailers." Ibid. While there is typically one manufacturer and one retailer associated with a given item, the judge noted "there can be one or many wholesalers or distributors on a product's journey from manufacturer to consumer." Id. at 436. Thus, the judge found "the wholesaler-to-wholesaler exemption ensures that the fee is only paid once on the wholesale distribution level." Ibid. If the judge were to accept Cargill's position, then manufacturers' sales, except for sales directly to retailers or the

public, would satisfy the exemption and not be governed by the tax. Id. at 436-37.

Additionally, the judge rejected Cargill's argument that it should not be considered a manufacturer under the Act because its manufacturing operations occur outside of the state. Id. at 442. The judge found the Act's plain language "is not dependent on the location of the manufacturing, but rather where the product is consumed." Id. at 437. The judge noted the Act does not impose a tax on manufacturers' products that are shipped outside of the state. Ibid. Since in-state and out-of-state beef manufacturers are treated the same based on their actual sales, the judge also rejected Cargill's argument that the tax is unconstitutional. Ibid.

Judge Cimino found Random House Inc. v. Director, Division of Taxation was relevant to the current matter.[2] In Random House, the Tax Court found the corporation was a manufacturer pursuant to N.J.A.C. 18:38-1.3, because it selected the physical printing, binding, and formatting of its books, despite farming out the manufacturing to third parties. Id. at 499. Here, the judge emphasized that Cargill was similarly "very much a participant in the manufacturing process regardless of where the manufacturing took place." Cargill II, 32 N.J. Tax at 441. Considering the plain words of the Act and its

_____
[2] 22 N.J. Tax 485 (Tax 2005).

legislative history, as well as its regulatory interpretation, the judge concluded that Cargill was not eligible for the wholesaler-to-wholesaler exemption. Id. at 442. This appeal followed.

Cargill presents the following arguments for our consideration:

> (1) the Division's and Judge Cimino's determinations are not entitled to deference;
>
> (2) the litter fee was "turned off" for the years at issue;
>
> (3) Cargill is entitled to exclude the wholesale sales it made to other wholesalers from the computation of the levy; and
>
> (4) Judge Cimino's imposition of a tax on Cargill's manufacturing operations in New Jersey violates the Commerce Clause.

We granted leave to the New Jersey Business & Industry Association (NJBIA) to file an amicus curiae brief, which supports Cargill's contentions.

## II.

Appellate courts apply "a highly deferential standard of review" to the decisions of a Tax Court judge, Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 375 (App. Div. 2001), because "judges presiding in the Tax Court have special expertise," Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 46 (App. Div. 1990). When reviewing a Tax Court's factual findings, an appellate court examines "whether the findings of fact are supported by substantial credible evidence with due regard to the Tax Court's expertise and

16

ability to judge credibility." Yilmaz, Inc. v. Dir., Div. of Tax'n, 390 N.J. Super. 435, 443 (App. Div. 2007). Consequently, we do not disturb a Tax Court's factual findings "unless they are plainly arbitrary or there is a lack of substantial evidence to support them." Glenpointe, 241 N.J. Super. at 46. Appellate review of a Tax Court's legal decisions, however, is de novo. N.J. Tpk. Auth. v. Twp. of Monroe, 30 N.J. Tax 313, 318 (App. Div. 2017).

Moreover, the standard of review governing "a motion to dismiss applies to the Tax Court in the same manner as to any other trial court." Passarella v. Twp. of Wall, 22 N.J. Tax 600, 603 (App. Div. 2004) (citing R. 4:1). Pursuant to Rule 4:6-2(e), appellate courts apply a plenary standard of review from a trial court's decision on a motion to dismiss. Sickles v. Cabot Corp., 379 N.J. Super. 100, 105-06 (App. Div. 2005). Therefore, we owe no deference to the Tax Court's conclusions. Rezeem Fam. Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011). The appellate court's task, then, is to liberally review the pleadings in order to "ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (quoting Di Cristofaro v. Laurel Grove Mem. Park, 43 N.J. Super. 244, 252 (App. Div. 1957)).

17

We review a motion for summary judgment using the same standard applied by the Tax Court—"whether, after reviewing 'the competent evidential materials submitted by the parties' in the light most favorable to [the non-moving party], 'there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Because we review the Tax Court's denial of summary judgment to Cargill, our review is de novo. Waksal v. Dir., Div. of Taxation, 215 N.J. 224, 231-32 (2013).

On appeal, Cargill reiterates its argument made before Judge Cimino that the Legislature did not make the appropriations required by the Act for the years at issue—2014 and 2015. Cargill claims the Division wants to collect the litter tax that the Legislature "turned off," for the years at issue. Cargill avers the Legislature did not intend General Provision 2 to satisfy the appropriation requirement under the Act and that the Legislature made the "deliberate choice" to stop making an appropriation of the tax as required by N.J.S.A. 13:1E-217, -223. In comparison to how the Legislature earmarks other tax funds, Cargill argues the Legislature does not rely on General Provision 2; rather, it makes explicit appropriations for these funds.

18

Cargill further asserts General Provision 2 would also fail as an appropriation of the tax under the New Jersey Constitution. Even if the tax was not "turned off" during the years at issue, Cargill contends its sales to wholesalers satisfies the wholesaler-to-wholesaler exemption in the Act. Finally, Cargill argues if the tax is upheld, then the matter should be remanded to apportion the value of its goods associated with out-of-state manufacturing and in-state wholesale transactions to comply with the Commerce Clause of the United States Constitution.

In its amicus brief, NJBIA contends the Legislature did not expressly appropriate the Fund pursuant to N.J.S.A. 13:1E-217 in any of the Appropriation Acts for the years at issue. In the alternative, NJBIA claims if the Legislature had appropriated the Fund, it could only have done so through the Dedication Clause; however, that would have violated Article VIII, Section II, Paragraph 2, and Article V, Section I, Paragraph 15 of the Constitution. The NJBIA contends there is no legislative history evidencing an intent to appropriate the Fund through the Dedication Clause, and the fact that the Fund was ultimately distributed pursuant to N.J.S.A. 13:1E-217 is "irrelevant" as to whether the Legislatures that enacted the Appropriation Acts for the years at issue intended to impose the tax.

A.

The Tax Was Not "Turned Off" For The Years At Issue

First, Cargill argues the Legislature made specific appropriations for the years immediately following the enactment of the Act, in accordance with N.J.S.A. 13:1E-217, -223, but not for the years at issue. Instead, Cargill notes the Legislature only made a $300,000 appropriation for public education detailed in N.J.S.A. 13:1E-218(d). In Cargill's view, the tax was "turned off" for the years at issue because "there was no language anywhere in" the Appropriations Acts regarding the Act or the tax, and a certification should have been issued under N.J.S.A. 13:1E-223(b).

The litter tax is imposed on "each person engaged in business in the state as a manufacturer, wholesaler, or distributor of litter-generating products." N.J.S.A. 13:1E-216(a). It constitutes "an excise tax on the privilege of engaging in business in New Jersey as a manufacturer, wholesaler, distributor, or retailer of litter-generating products measured by gross receipts from sales of such products within or into New Jersey."[3] United Jersey Bank v. Dir., Div. of Tax'n, 12 N.J. Tax 516, 519-20 (Tax 1992); Feesers, Inc. v. Dir., Div. of Tax'n, 20 N.J. Tax 201, 204-05 (Tax 2002).

---

[3] Cargill concedes its products are "litter-generating products" pursuant to the Act and that it sells these products within this state.

During the years at issue, the Legislature rejected all statutorily created poison pill provisions. Notably, the Appropriations Acts for the years at issue each stated:

> To the extent that these or other statutory programs have not received all or some appropriations for the current fiscal year in this Appropriations Act which would be required to carry out these statutory programs, such lack of appropriations represents the intent of the Legislature to suspend in full or in part the operation of the statutory programs, including any statutorily imposed restrictions or limitations on the collection of [s]tate revenue that is related to the funding of those programs.
>
> [L. 2014, c. 14, § 72 at 370; L. 2015, c. 63, § 71 at 598 (emphasis added).]

Therefore, the Legislature purposely suspended all statutory poison pill provisions that would have suspended the collection of statutorily dedicated fees. Furthermore, the specific provision of the Appropriation Acts for the years at issue each provide that:

> Notwithstanding the provisions of [N.J.S.A. 52:34-6] or any other law to the contrary, monies appropriated to the . . . [DEP] from the [Fund] shall be provided by the department to the . . . [(CCC)] pursuant to a contract between the department and the [CCC] to implement the requirements of the Clean Communities Program.

21

Thus, the Legislature intended for the continuation of the Clean Communities Program and intended for DEP to enter a contract to implement it. In effect, the Legislature intended that the tax be collected, and monies be appropriated[5] for the Clean Communities Program, which the contract was supposed to implement. Moreover, DEP's executed contracts with the CCC for the years at issue evidences the appropriation of the Fund.

In addition, the Act requires the organization under contract with the DEP to submit an annual report to the Governor and the Legislature that outlines how the organization spent the monies allotted to it under the contract. N.J.S.A. 13:1E-217(f). For the years at issue, the CCC sent annual reports outlining expenditures of the Fund that the Legislature had appropriated. These expenditures included consultants, rent, telephone, insurance, postage, supplies, equipment, printing, special events, travel, and other expenses.

---

[4] Cargill challenges its litter tax assessment for 2014 and 2015. These years fall within three state fiscal years because each fiscal year begins on July 1 and ends on June 30 of the following calendar year.

[5] Since this specific provision in the Appropriation Acts states, "monies appropriated," rather than "monies hereby appropriated," the Legislature likely meant to appropriate the Fund through another provision of the Appropriation Act, namely General Provision 2, which we discuss later in our opinion.

Lastly, Cargill's argument that the tax was "turned off" because the Legislature previously appropriated the Fund by a specific line item but subsequently implemented General Provision 2 lacks merit. The "dedicated funds" provision of General Provision 2 did not appear until the 2006 fiscal year's Appropriations Act. Compare L. 2005, c. 132 with L. 2004, c. 71. Clearly, during the early years of the Fund, the Legislature had to use a specific line item because the dedicated funds provision was not available. The judge correctly determined the tax was not "turned off."

B.

The Fund Was Properly Appropriated Through General Provision 2.

Next, Cargill contends the Legislature did not intend General Provision 2 to satisfy the Appropriation requirement under the Act. Because General Provision 2 appeared in Appropriation Acts prior to the Act's enactment in 2002, Cargill posits the Legislature did not intend its "generic, standard language" to satisfy the appropriation requirement of the Act. Regarding the "dedicated funds" language contained in General Provision 2, Cargill asserts only monies "dedicated" under the Constitution are covered.

Concerning the "dedicated funds" language in General Provision 2, Cargill argues only monies "dedicated" under the Constitution are covered. As to the "in excess of those anticipated" language in General Provision 2, Cargill

23

claims it only applied if there was a specifically appropriated amount that was "anticipated" and exceeded, allowing the Treasury to disperse "excess" funds. In Cargill's view, neither situation should apply to the Fund.

Cargill also compares the Legislature's approach to other earmarked funds, such as the Energy Tax Receipts Property Tax Relief Fund, N.J.S.A. 52:27D-441(a), the hotel and motel fee, N.J.S.A. 54:32D-2(a), and the recycling tax, N.J.S.A. 13:1E-96, to illustrate the Legislature's approach of making explicit appropriations without relying on General Provision 2. Further, Cargill maintains the judge erred in interpreting General Provision 2 as an appropriation of the Fund, violating the doctrine of constitutional avoidance. Cargill alleges "[t]here is no such thing as a 'statutory dedication' outside of the annual [A]ppropriation [A]ct." Cargill argues grouping numerous items into the "vague" and "undescriptive" General Provision 2 would deprive the Governor of line-item veto power.

Finally, Cargill claims General Provision 2 cannot be constitutionally used as an appropriation of the Fund. Although there are "no specific constitutional standards or rules for determining the content or format of an [A]ppropriations [A]ct," Karcher, 97 N.J. 483 at 491, Cargill claims General Provision 2 provides no "specific purpose" and is devoid of any information regarding spending. Cargill points out, however, the Legislature historically

24

appropriated the Fund "for the purposes set forth in subsections a., b., c., and d. of [N.J.S.A. 13:1E-217]," as required by Karcher.

N.J.S.A. 13:1E-223(a)(3) provides that future Legislatures "shall, without other conditions, limitations or restrictions," appropriate monies in the Fund "for the purposes set forth in" N.J.S.A. 13:1E-217. If the money is appropriated for purposes other than the delineated purposes in N.J.S.A. 13:1E-217, then the OMB Director must so certify to the Director of the Division, and the tax collection provisions will "be without effect" ten days later. N.J.S.A. 13:1E-223(b), -216(h). Cargill concedes the OMB Director never certified non-compliance here. Although Cargill contends the Legislature did not properly appropriate the funds, Cargill does not dispute the funds were spent.

For the years at issue, the Legislature appropriated the Fund through General Provision 2 of the annual Appropriation Act, and it was subsequently disbursed and expended for its statutorily dedicated purpose. General Provision 2, as stated in each of the Appropriation Acts for the years at issue, provides:

> All dedicated funds are hereby appropriated for their dedicated purposes. There are appropriated, subject to allotment by the [OMB] Director . . . and with the approval of the Legislative Budget and Finance Officer, private contributions, revolving funds and dedicated funds received, receivable or estimated to be

received for the use of the [s]tate or its agencies in excess of those anticipated, unless otherwise provided herein. The unexpended balances at the end of the preceding fiscal year of such funds, or any portion thereof, are appropriated, subject to the approval of the [OMB] Director. . . .

[L. 2013, c. 77, § 2 at 823; L. 2014, c. 14, § 2 at 357-58; L. 2015, c. 63 § 2 at 584.]

"The goal in cases of statutory construction is simple. It is the court's duty to seek and give effect to the Legislature's intent," Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 443-44 (2016), the best indicator of which is, ordinarily, the statute's language, DiProspero v. Penn, 183 N.J. 477, 492 (2005). Although it is well-settled tax laws are "strictly construed against the state," Stryker Corp. v. Dir., Div. of Tax'n, 168 N.J. 138, 155 (2001) (quoting 3A Norman J. Singer, Sutherland Statutory Construction § 66.01 (5th ed. 1992)), they nevertheless "also must be construed reasonably so that the Legislature's purpose in enacting the statute is not destroyed," ibid. (citing Sutherland, § 66.02). "[B]ecause tax liability is established by way of revenue legislation, all the rules of statutory construction are relevant in the interpretation of revenue measures." Ibid. (internal quotation marks omitted) (quoting Sutherland, § 66.03).

General Provision 2 is constitutionally sufficient to appropriate the Fund. Our review of rulings of law and issues of constitutionality or

26

interpretation of statutes is de novo. State v. Hemenway, 239 N.J. 111, 125 (2019). "Our courts have demonstrated a steadfast adherence to the principle 'that every possible presumption favors the validity of an act of the Legislature.'" State v. Trump Hotels & Casino, 160 N.J. 505, 526 (1999) (quoting N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8 (1972)). We must "exercise 'extreme self restraint' before using 'the judicial power to invalidate a legislative act[,]' and we will not declare a legislative act void 'unless its repugnancy to the Constitution is clear beyond a reasonable doubt.'" LaManna v. Proformance Ins. Co., 184 N.J. 214, 223 (2005) (alteration in original) (quoting Trump Hotels & Casino, 160 N.J. at 526).

Our Court has held there are "no specific constitutional standards or rules for determining the content or format of an appropriations act. Therefore, some inherent flexibility and discretion attend the fiscal-formulation process." Karcher, 97 N.J. at 491. The Court also made a distinction between "budgeted revenue" and "appropriated revenue" in the Appropriation Act. Ibid.

While budgeted revenue is "a reservation or designation of a specific amount of money for a particular purpose," appropriated revenue is "reflected in the budget not as a specific numerical figure but by means of general language committing funds in an unspecified amount for a particular purpose."

Ibid. The Legislature's reliance on General Provision 2 to appropriate the revenues of the Fund in unspecified amounts conforms with Karcher because they were expended for their statutorily dedicated purpose.

Here, the record shows the OMB Director certified that the Fund was "appropriated" through General Provision 2 for the years at issue. The OMB Director certified the Fund is "just one of over 400 funds that the Legislature annually appropriates through [General Provision 2] as 'dedicated' and/or 'revolving' funds." We already noted the DEP executed contracts with the CCC for the years at issue, evidencing appropriation of the Fund. The contracts explain that "funding under this contract is expressly dependent upon availability to the Department of funds appropriated by the State Legislature." Attachment "A" to the contracts state that "[b]ased upon the funds available to the Department in the [s]tate's fiscal year, the contract . . . is fully funded." (emphasis added).

We are convinced the Legislature intended for the continuation of the Clean Communities Program and intended for DEP to enter a contract to implement it. Accordingly, the Legislature intended that the litter tax be collected, and monies be appropriated for the Clean Communities Program, which the contract was supposed to implement. In fact, DEP executed contracts for the years at issue, demonstrating the appropriation of the Fund.

28

In sum, the Fund was appropriated by General Provision 2 and thereafter distributed and expended pursuant to its statutorily dedicated purpose. We reject Cargill's argument that imposition of the tax was suspended during the years at issue.

III.

A.

<u>The Wholesaler-to-Wholesaler Exemption</u>

We next address Cargill's argument that in the event the litter tax was not "turned off" during the years at issue, it satisfies the wholesaler-to-wholesaler exemption in the Act. Cargill contends it "engaged in business in this [s]tate as a . . . wholesaler" under N.J.S.A. 13:1E-216 because it conducts "sales for resale" and does not engage in manufacturing in this state. Cargill maintains N.J.S.A. 13:1E-216(a) states the individual must be "engaged in the business in the state as a manufacturer."

Cargill also claims the Act's corresponding regulation, N.J.A.C. 18:38-1.3, conflicts with the Act because it defines "manufacturer" as one "who engages in . . . processing of any litter-generating product regardless of whether the manufacturing activity occurs within or outside New Jersey," and therefore, the Act's interpretation prevails. Cargill also claims Judge Cimino's reliance on <u>Random House</u>, 22 N.J. Tax 499, is misplaced because he did not

29

address whether Cargill's manufacturing operations outside of the state affected its wholesaler-to-wholesaler sales within this state. In applying the definitions laid out above, Cargill does not qualify under the wholesaler-to-wholesaler exception.

We begin with the statute's language, ascribing to the "words their ordinary meaning and significance," DiProspero, 183 N.J. at 492, that is "unless the Legislature has used technical terms, or terms of art," Marino v. Marino, 200 N.J. 315, 329 (2009), "which are construed 'in accordance with those meanings,'" Praxair Tech., Inc. v. Dir., Div. of Tax'n, 201 N.J. 126, 136 (2009) (quoting In re Lead Paint Litig., 191 N.J. 405, 430 (2007)).

The plain language of N.J.S.A. 13:1E-216 states the Act imposes the tax on in-state sales by a "manufacturer, wholesaler, or distributor of litter-generating products" and on sales by a "retailer" of those same products. The Act provides an exemption when the sale is by a "wholesaler or distributor to another wholesaler or distributor." N.J.S.A. 13:1E-216. Because the term "manufacturer" is excluded from the exemption, the Legislature unambiguously expressed that only a wholesaler or distributor is eligible for the exemption. In this regard, "[t]he canon of statutory construction, expression unions est exclusion alterius—expression of one thing suggests the

exclusion of another left unmentioned—sheds some light on the interpretative analysis." Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 112, 853 (2004).

Here, Judge Cimino correctly determined that the "carefully drafted statute swept up manufacturers as entities whose sales would be subject to the fee" and "[t]o deem manufacturers as wholesalers would render any reference to the term manufacturer superfluous." See Premier Physician Network, LLC v. Maro, 468 N.J. Super. 182, 193 (App. Div. 2021) ("We 'must presume that every word in a statute has meaning and is not mere surplusage,' and we 'give effect to every word' so we do not 'construe the statute to render part of it superfluous.'").

Regarding the Legislature's intent, the Act noted that "an uncluttered landscape is among the most priceless heritages which New Jersey can bequeath to posterity" and "the litter problem is especially serious in a state as densely populated and heavily traveled as New Jersey." N.J.S.A. 13:1E-214. Thus, the Legislature clearly enacted the Act to "promote and encourage a clean and safe environment." Ibid. The Act imposes a tax on "sales of those products within the [s]tate" by individuals engaged in business in the state as a "manufacturer," rather than the process of manufacturing within the state. N.J.S.A. 13:1E-216(a); N.J.S.A. 13:1E-215(k) (defining "sold within the state"

31

or "sales within the state" as "in the case of manufacturers, wholesalers, and distributors, all sales of products for use and consumption within the [s]tate").

It would be contrary to the Legislature's intent to impose a tax on an in-state manufacturer but exempt a manufacturer that manufactures litter-generating product outside of the state, when both manufacturers are engaged in the same activity the Legislature meant to tax—selling litter-generating products in the state.  As Judge Cimino emphasized, since 99.8% of Cargill's sales are to wholesalers, "[t]o now allow manufacturers to claim they are wholesalers would gut the intent of the Legislature to impose the fee on the manufacturing level."  Cargill II, 32 N.J. Tax at 436.  The exemption also avoids double counting of the tax ensuring that it is "paid only once at each of the three levels of sales by manufacturers, wholesalers/distributors and retailers."  Ibid.  While typically there is only one manufacturer and retailer, there can be many wholesalers associated in a product's supply chain; thus, the exemption ensures the fee is paid once on the wholesale/distribution level.

Furthermore, in Random House, the Tax Court found an out-of-state book publisher that sold its products to wholesalers in New Jersey was ineligible for the wholesaler-to-wholesaler exemption.  22 N.J. Tax at 487-88. The company was mostly selling its product to "wholesalers or distributors who purchased books in large quantities."  Id. at 488.  The company

32

determined where printing and binding of the books took place, as well as the books' format, graphics, and print styles. Id. at 498-99. The Tax Court found the company was a manufacturer, not a wholesaler. Id. at 498. We affirmed the Tax Court's decision. Random House, Inc. v. Dir., Div. of Tax'n, 23 N.J. Tax 291 (App. Div. 2006). In a similar vein, Cargill is a manufacturer of litter-generating products, thereby disqualifying it from the wholesaler-to-wholesaler exemption. These regulations are consistent with the Act, especially regarding the interpretation of the wholesaler-to-wholesaler exemption.

Finally, the Legislature's inaction to step in to override these regulations suggests its approval with their definitions of "manufacturer" and "wholesaler." See In re N.J.A.C. 17:2-6.5, 468 N.J. Super. 229, 237 (App. Div. 2021) (quoting Malone v. Fender, 80 N.J. 129, 137 (1979)) ("'[A]n agency's construction of a statute over a period of years without legislative interference will under appropriate circumstances be granted great weight as evidence of its conformity with the legislative intent.'"). Accordingly, we are convinced the judge did not err in denying Cargill's eligibility for the wholesaler-to-wholesaler exemption.

B.

The Commerce Clause

Lastly, Cargill relies on <u>Tyler Pipe Industries, Inc. v. Washington State Department of Revenue</u>, 483 U.S. 232, 251 (1987), for the proposition that "manufacturing and wholesaling are not substantially equivalent activities." Cargill asserts the judge "blended" its manufacturing operations outside the state with its wholesale activities within the state, upholding a tax imposed on the total value of goods sold in the state and manufactured outside the state. In <u>Oklahoma Tax Commission v. Jefferson Lines, Inc.</u>, 514 U.S. 175, 190 (1995), <u>superseded by statute</u>, 49 U.S.C. § 14505, Cargill contends the United States Supreme Court held gross receipt taxes are "required to be apportioned to reflect the location of the various interstate activities by which it [is] earned." Accordingly, Cargill argues the judge erred in not apportioning the total value of goods that were manufactured outside of the state and associated with wholesale selling within the state. We disagree.

The Commerce Clause provides "[t]he Congress shall have the Power . . . to regulate Commerce . . . among the several [s]tates. . . ." <u>U.S. Const.</u> art. I, § 8, cl. 3. In addition to authorizing Congress to regulate interstate commerce, the Commerce Clause "limits the power of the [s]tates to discriminate against interstate commerce. This so-called 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory

A-1537-21

measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).

"[I]n all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Granholm v. Heald, 544 U.S. 460, 472 (2005) (quoting Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or., 511 U.S. 93, 99 (1994)).  Without question, the Act does not mandate differential treatment; the tax has no extra-territorial reach beyond this state.  The tax is imposed "on sales" of litter-generating products "within the [s]tate," N.J.S.A. 13:1E-216, that "are for use and consumption within the [s]tate," N.J.S.A. 13:1E-215(k).  The tax does not apply to sales of products that are "shipped out of [s]tate for out-of-[s]tate use." Ibid.

Cargill's reliance on Tyler and Jefferson Lines is misplaced.  First, Tyler held that a tax on a manufacturer's wholesaling receipts need not be fairly apportioned between its in-state and out-of-state activities because its wholesaling "must be viewed as a separate activity conducted wholly within [the state] that no other [s]tate has jurisdiction to tax."  483 U.S. at 251. Similarly, there is no need to apportion the tax here between the value of Cargill's products attributable to this state and other states.  Additionally,

35

<u>Jefferson Lines</u> held that a tax did not violate the Commerce Clause because it reached "only the activity taking place within the taxing state, that is, the sale of [bus tickets,]" which included transportation to other states. 514 U.S. at 196. In the matter under review, the tax is only imposed on the sale of litter-generating products sold in this state. Consequently, we need not reach the issue of whether the Act falls within the narrow circumstances under which the Commerce Clause tolerates discrimination between in-state and out-of-state commercial interests.[6]

Furthermore, Cargill's argument that the litter tax is not fairly apportioned is misguided. A tax is fairly apportioned if it is internally and externally consistent. Thus,

> [t]he first . . . component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business'

---

[6] In any event, the Division satisfies the constitutional standard. "The United States Supreme Court has set forth a four-part test in determining whether a tax can be sustained against a Commerce Clause challenge: whether the tax (1) is applied to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state." <u>Stryker Corp.</u>, 168 N.J. at 152 (citing <u>Complete Auto Transit, Inc. v. Brady</u>, 430 U.S. 274, 282 (1977)). Cargill waived its challenge under prongs one, three, and four because Cargill only contends the tax was required to be apportioned. Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 5 on <u>R.</u> 2:6-2 (2023) ("It is, of course, clear that an issue not briefed is deemed waived.").

income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated.

[Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169-70 (1983).]

The litter tax is fairly apportioned, that is, it is internally and externally consistent. Regarding internal consistency, if every state imposed a tax on a manufacturer's sale of litter-generating products in that state only, no "multiple taxation" would occur. See Mack-Cali Realty Corp. v. State, 466 N.J. 402, 443-44 (App. Div. 2021). For example, a manufacturer would pay the tax in New Jersey for its sales in New Jersey and a tax in Pennsylvania for its sales in Pennsylvania. And, the tax is externally consistent because it is imposed only on Cargill's sale of litter-generating products in this state. See Jefferson Lines, 514 U.S. at 176 (Sales taxes are "properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future.").

In sum, the material facts here are not disputed, and even when viewed in the light most favorable to Cargill, the Division was entitled to summary judgment as a matter of law. The judge's findings are supported by substantial credible evidence in the record, and his legal conclusions are sound and

37

consistent with the applicable law. Accordingly, there is no basis to disturb the order granting summary judgment to the Division.

To the extent we have not addressed them, any additional arguments raised by Cargill and NJBIA do not have sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1537-21